UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                -v.-<br><br>HIKMAT HAMED,<br><br>                Defendant. | 17 Cr. 302-1 (KPF)<br><br>**ORDER** |

KATHERINE POLK FAILLA, District Judge:

Defendant Hikmat Hamed, who is currently incarcerated at the Federal Correctional Institution in Texarkana, Texas ("FCI Texarkana"), has applied for compassionate release, in the form of immediate release to home confinement, pursuant to 18 U.S.C. § 3582(c)(1)(A). (Dkt. #237, 250). In brief, he contends that he is at an increased risk of contracting, or of having a greater reaction to infection from, the COVID-19 virus because of pre-existing medical conditions. The Government opposes this motion. (Dkt. #243). As set forth in the remainder of this Order, the Court denies Mr. Hamed's motion for compassionate release.

## BACKGROUND

In May 2017, Mr. Hamed and five others were charged with (i) conspiracy to distribute controlled substances, specifically, synthetic cannabinoids, in violation of 21 U.S.C. § 846; and (ii) conspiracy to introduced misbranded drugs into interstate commerce, in violation of 18 U.S.C. § 371. (Dkt. #2). Later that month, a superseding indictment was returned (the "S1 Indictment"), repeating these charges and adding two firearms charges against two of Mr. Hamed's co-defendants. (Dkt. #23).

Based on the evidence submitted to the Court over the course of numerous pretrial and pre-sentencing motions, as well as multiple sentencings, Mr. Hamed was at the apex of the charged conspiracy. (Revised Final Presentence Investigation Report ("PSR") ¶¶ 15-38). Using bank accounts he controlled, and the cover of his legitimate tobacco business, Mr. Hamed arranged for the importation of synthetic chemicals from overseas; purchased inert plant material onto which the chemicals could be sprayed; and secured foil pouches in which the product could be packaged for distribution. (*Id.* at ¶ 31). The conspiracy, which spanned multiple states, was responsible for at least 300 kilograms of mixtures and substances containing synthetic cannabinoids. (*Id.* at ¶ 29). As the Government notes

> The DTO's [Drug Trafficking Organization] distribution network extended throughout numerous states, including New York, Virginia, Wisconsin, Illinois, Missouri, Kentucky, Indiana, and Minnesota. The DTO also deliberately misbranded the synthetic cannabinoids in order to, among other things, reduce the odds of detection by law enforcement. In recorded phone conversations, members of the DTO discussed how their product was more potent than the product created by competitors, including discussions of how human testers were experiencing side-effects from sampling the product, including nausea, dizziness, and disorientation. Members of the DTO also possessed firearms and threatened violence in connection with their participation in the DTO. DEA agents seized approximately 10 guns from members of the DTO, including two firearms from the defendant. During the course of the wiretap investigation, the DEA reviewed calls in which the defendant discussed using firearms to threaten and shoot other people, including suspected law enforcement agents conducting surveillance outside of the defendant's warehouse.

(Dkt. #243 at 2 (record citations omitted)). In November 2017, while on pretrial release, Mr. Hamed was intercepted attempting to induce a woman to cross state lines in order to work for him as a prostitute. (PSR ¶ 36). In addition, law enforcement officers found disturbing images on a cell phone seized from Mr. Hamed in the course of his arrest. (*Id.* at ¶¶ 37-38).

On May 23, 2018, Mr. Hamed pleaded guilty to Count Two of the S1 Indictment pursuant to a plea agreement with the Government. (Dkt. #109 (plea transcript)). In relevant part, the parties stipulated that while the applicable range under the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") would otherwise be 210 to 262 months' imprisonment, because of the statutory maximum associated with Count Two, the Guidelines range became 60 months' imprisonment. (PSR ¶ 7).

Mr. Hamed and his co-defendants engaged in extensive pre-sentencing motion practice, both oral and written. (*See, e.g.*, Dkt. #148, 162). Mr. Hamed's sentencing was held on January 9, 2019, at which time the Court sentenced him principally to a term of 60 months' imprisonment. (Dkt. #193 (judgment), 208 (sentencing transcript)). In imposing sentence, the Court observed:

> I think Mr. Hamed is perhaps the member of this conspiracy that is the most difficult to sentence because he is so stark in the dichotomy of the good things that he has done and the bad things that he has done. And though I would not admit to being up at the same time Mr. Ricco was in preparing his supplemental submission, I have spent a number of days and a number of hours thinking about what is the right sentence in this case.

3

> As hard as I consider all of the factors I keep returning to the bad, to how bad the conduct was.  Mr. Hamed was too integral to too large an organization. The organization itself wasn't large but the amount of product they distributed was.  He was too aware, not only of the damage that could be caused but of the damage that was in fact being caused.  And though he, himself, may not have been violent — that is something that I suppose is up for dispute in some of these telephone calls — he was comfortable associating himself with people who espoused or were at least comfortable resorting to violence.  While I won't get into it specifically on this record, the [discussion regarding prostitution referred to] in paragraph 36 is egregious and something with which I think, well, I think it is worthy of consideration and I disagree with defense counsel's explanation of it.
>
> With respect to [the disturbing images from Mr. Hamed's cell phone discussed in paragraph] 37, … I do think that this is again reprehensible, egregious conduct that does say something as well as the good things say something about Mr. Hamed's character.

(Dkt. #208 at 56-57).

Mr. Hamed filed his counseled motion for compassionate release on May 11, 2020.  (Dkt. #237).  In it, he noted that "on March 31, 2020, Hikmat Hamed submitted a letter to his Case Manager at FCI Texarkana requesting release to home detention as a result of his pre-existing medical conditions and the coronavirus pandemic." (*Id.* at 8).  However, in its opposition, the Government presented documentation from the BOP indicating that Mr. Hamed had not filed a request for compassionate release with the BOP in March.  (Dkt. #243 at 4).  Through counsel, Mr. Hamed filed such a request with the BOP on May 15, 2020.  (*Id.* at Ex. B).

## APPLICABLE LAW

Under 18 U.S.C. § 3582(c)(1)(A), as modified by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), a court may reduce a defendant's sentence upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant. A defendant may move under § 3582(c)(1)(A) only after the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

When considering an application under § 3582(c)(1)(A), a court may reduce a defendant's sentence only if it finds that "extraordinary and compelling reasons warrant such a reduction," and that "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). In making this determination, the court must consider the "the factors set forth in [18 U.S.C. § 3553(a)] to the extent that they are applicable." *Id.* § 3582(c)(1)(A). "The defendant has the burden to show he is entitled to a sentence reduction." *United States* v. *Ebbers*, No. 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) (citing *United States* v. *Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992)).

Congress has delegated responsibility to the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction." 28 U.S.C. § 994(t). The Sentencing Commission has determined that a defendant's circumstances meet this standard, *inter alia*,

when the defendant is "suffering from a terminal illness" or a "serious physical or medical condition ... that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," or if, in the judgment of the BOP, the defendant's circumstances are extraordinary and compelling for "other reasons."  U.S.S.G. § 1B1.13(1)(A) & Application Note 1(A), (D).  Following the passage of the First Step Act, courts may independently determine whether such "other reasons" are present in a given case, without deference to the determination made by the BOP.  *See United States* v. *Lisi*, No. 15 Cr. 457 (KPF), 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020).  In addition, the Sentencing Commission counsels that a court should reduce a defendant's sentence only after determining that "[t]he defendant is not a danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(2).

## DISCUSSION

On June 12, 2020, Mr. Hamed requested that the Court refrain from deciding Mr. Hamed's motion until after June 15, 2020, when his administrative remedies would be exhausted.  (Dkt. #250).  The Government agrees that Mr. Hamed's administrative remedies would be exhausted after June 15, 2020.  (Dkt. #243).  Thus, Mr. Hamed's motion is now properly before the Court.  The issue at hand is whether Mr. Hamed has identified "extraordinary and compelling reasons" warranting his release.  The Court finds that he has not.

As noted, Mr. Hamed argues that the conditions of his incarceration at FCI Texarkana place him at a higher risk of contracting COVID-19 (or of having a more severe reaction if contracted), because of the nature of his confinement at the facility, his existing medical conditions, and the claimed inability of prison staff to handle the outbreak. The Court recognizes, as do the parties, that sister courts in this District have granted, and denied, compassionate release motions based on the existence of the COVID-19 pandemic and the risks of its transmission at prisons. *See generally United States* v. *Morrison*, No. 16 Cr. 551-1 (KPF), 2020 WL 2555332, at *2 (S.D.N.Y. May 20, 2020); *see also United States* v. *Kerrigan*, No. 16 Cr. 576 (JFK), 2020 WL 2488269, at *3 (S.D.N.Y. May 14, 2020) (collecting cases). This Court aligns itself with those courts that have found "that the risks posed by the pandemic alone do not constitute extraordinary and compelling reasons for release, absent additional factors such as advanced age or serious underlying health conditions that place a defendant at greater risk of negative complications from the disease." *United States* v. *Nwankwo*, No. 12 Cr. 31 (VM), 2020 WL 2490044, at *1-2 (S.D.N.Y. May 14, 2020) (collecting cases); *see also United States* v. *Brady*, No. 18 Cr. 316 (PAC), 2020 WL 2512100, at *3 (S.D.N.Y. May 15, 2020) ("Instead, compassionate release motions amid the COVID-19 pandemic have required a 'fact-intensive' inquiry, made in the 'unique circumstances' and 'context' of each individual defendant. In practice, courts in this district have considered the age of the prisoner; the severity and documented history of the defendant's health conditions, as well as the defendant's history of managing

7

those conditions in prison; the proliferation and status of infections in the prison facility; the proportion of the term of incarceration that has been served by the prisoner; and the sentencing factors in 18 U.S.C. § 3553(a), with particular emphasis on the seriousness of the offense, the deterrent effect of the punishment, and the need to protect the public." (internal citations omitted)).

Mr. Hamed has not demonstrated the existence of extraordinary and compelling circumstances in his case. Mr. Hamed is 36 years old, which would otherwise place him at a comparatively low risk of hospitalization or death from COVID-19. *See* Weekly Updates by Select Demographic and Geographic Characteristics, CENTER FOR DISEASE CONTROL, https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#AgeAndSex (accessed June 17, 2020). Mr. Hamed focuses, however, on his putative co-morbidities of ventricular hypertrophy and chronic hypertension. (Dkt. #237 at 3). Significantly, however, while listing the medications he takes in BOP custody (*id.* at 3-4), Mr. Hamed in no way suggests that he has been unable to manage these conditions, or that the BOP has in any way neglected his care, even during the pendency of the pandemic. *See, e.g.*, *Brady*, 2020 WL 2512100, at *3-4 (acknowledging serious nature of defendant's medical conditions but denying compassionate release where conditions stable and managed in BOP facility); *United States* v. *Garcia*, No. 18 Cr. 802, 2020 WL 2468091, at *5-6 (S.D.N.Y. May 13, 2020) (denying compassionate release to

defendant with asthma, hypertension, and heart conditions housed in facility with 40 documented cases of virus).

Federal courts, including this Court, have been appropriately concerned about the conditions of confinement at federal facilities. *See, e.g.*, *United States* v. *Park*, No. 16 Cr. 473 (RA), 2020 WL 1970603, at *2 (S.D.N.Y. Apr. 24, 2020). For its part, this Court has scrutinized the BOP's Pandemic Influenza Plan, *see* https://www.bop.gov/coronavirus/ (accessed June 17, 2020), as well as the BOP's listing of confirmed cases among inmates and staff at each facility. As of the writing of this Order, the BOP has identified one staff member at FCI Texarkana who has tested positive for COVID-19, although it is not clear to the Court whether that staff member was assigned to the correctional institution or to the adjacent minimum-security camp. The Court concludes on balance that the danger that Mr. Hamed faces from infection with COVID-19, even accounting for his medical conditions, does not amount to an extraordinary and compelling reason for granting compassionate release. *Cf. United States* v. *Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.").

Separately, the factors set forth in 18 U.S.C. § 3553(a) counsel against granting Mr. Hamed's motion. Those factors include "the nature and

circumstances of the offense and the history and characteristics of the defendant," as well as the need "to protect the public from further crimes of the defendant." *See* 18 U.S.C. § 3553(a)(1), (a)(2)(C).  As discussed above, Mr. Hamed was a linchpin of a wide-ranging conspiracy that distributed synthetic cannabinoids to multiple states, including New York.  Unlike some defendants in cases of this type, Mr. Hamed was keenly aware of the deleterious health consequences of the products he was distributing.  (*See* PSR ¶ 26 ("During recorded telephone conversations, members of the DTO discussed how their product was more potent than the product created by competitors.  They also discussed how they would test the product, and that the testers would frequently feel strong side-effects from sampling the product, including nausea, dizziness and disorientation."); *see also id.* at ¶ 21 ("In one such conversation that took place on November 13, 2016, HAMED and [a co-conspirator] discussed that approximately six synthetic cannabinoid users had recently died.")).  The conspirators also kept firearms, and not merely for defensive purposes.  (PSR ¶¶ 34-35 ("During intercepted conversations, DTO members discussed the reasons for possessing and using their guns, including for among other things, protection against being robbed; threatening customers who had not paid for narcotics; threatening competitors and potential law enforcement officers; and threatening members of the DTO when they engaged in arguments with each other.")).

Separate and apart from his extensive involvement in the charged conspiracy, Mr. Hamed engaged in additional criminal conduct.  As the Court

noted during his sentencing, Mr. Hamed solicited a woman to work for him as a prostitute while on pretrial release. (PSR ¶ 36). Even more disturbing are the images he maintained on his cell phone, the specifics of which are well known to the parties. (*Id.* at ¶ 37). In sum, the Court would undermine the § 3553(a) factors were it to allow Mr. Hamed to serve just 36 months of a 60-month sentence. Accordingly, even if the Court had found extraordinary and compelling circumstances on the facts presented, which it has not, it would deny Mr. Hamed's application.[1]

## CONCLUSION

For the foregoing reasons, Defendant Hikmat Hamed's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) is DENIED. The Clerk of Court is directed to terminate the motions at docket entry 237 and 250.

SO ORDERED.

Dated: June 17, 2020
New York, New York

*Katherine Polk Failla*

KATHERINE POLK FAILLA
United States District Judge

---

[1] To the extent he has not done so already, Mr. Hamed can pursue relief in the form of a furlough under 18 U.S.C. § 3622 or home confinement as contemplated in the CARES Act, Pub. L. No. 116-136 (2020), and the Attorney General's April 3, 2020 memorandum to the BOP. The decision to grant that relief, however, is reserved to the discretion of the BOP.